IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>$11,695.00 in U.S. CURRENCY,<br>Defendant. | Civil Action No. 1:20-cv-7 |

**<u>VERIFIED COMPLAINT OF FORFEITURE</u>**

NOW COMES Plaintiff, the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1. This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of the defendant property, which was furnished or intended to be furnished in exchange for a controlled substance, in violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, or represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate violation of the Controlled Substances Act.

2. This action is also brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant property which constitutes or was derived from proceeds traceable to an offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, specifically

the exchange of a controlled substance in violation of state or federal law.

3. The defendant property is $11,695.00 in U.S. Currency, which was seized on July 23, 2019, in Rougemont, North Carolina, while located within the jurisdiction of this Court, and has been deposited to the United States Marshals Service Seized Asset Deposit Fund.

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant property was seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

6. Upon the filing of this complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. The facts and circumstances supporting the seizure and forfeiture of the defendant property are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States

of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 6th day of January, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney


/s/ Steven N. Baker
Steven N. Baker
Assistant United States Attorney
NCSB #36607
101 S. Edgeworth Street, 4th Floor
Greensboro, NC   27401
Phone: (336)333-5351
Email: steve.baker3@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

_____
John E. Flamion, III
Task Force Officer
Drug Enforcement Administration

DECLARATION

I, John E. Flamion III, hereby state, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Task Force Officer with the United States Drug Enforcement Administration (DEA). My responsibilities include investigating criminal violations of the Federal Controlled Substance Act and related offenses. I have received numerous hours of training from the DEA in federal law enforcement and asset forfeiture. My primary assignment with the DEA is to investigate violations of the Controlled Substances Act and asset forfeiture cases originating from the Durham County Sheriff's Office (DCSO) and other local law enforcement agencies in North Carolina. I have been employed by the DCSO since 2009 and have been assigned as a Task Force Officer with the DEA Raleigh Heroin Enforcement Group since January 2018. I personally have been involved in numerous drug investigations and seizure cases at the state and federal level in North Carolina.

2. As a result of my training and experience obtained through my investigative efforts, I have gained significant knowledge in the field of drug law enforcement. I have learned the techniques and methods utilized by drug traffickers in negotiating, procuring, packaging, financing, and distributing illegal drugs. I am familiar with the methods used by drug traffickers to maintain records manufactured from the sale



of illegal controlled substances and the method in which they launder and conceal the proceeds from the sale of illegal controlled substances.

3.  This declaration is submitted in support of a Verified Complaint of Forfeiture of $11,695.00 of $12,183.00 in U.S. Currency seized on July 23, 2019, from Christopher Lee MOODY.

4.  In early 2019, the DCSO Anti-Crime/Narcotics unit was contacted by a Confidential Source (CS), who stated that an individual named "Chris Moody" was selling cocaine in Durham County, NC. The CS stated that "Chris Moody" was a white male that lived in the Rougemont/Bahama area of Durham County. Furthermore the CS stated that "Chris Moody" was previously incarcerated in federal prison for a significant amount of time for trafficking cocaine, which occurred in Florida. The CS was also able to provide the cell phone number for "Chris Moody." Through various law enforcement databases, DCSO Detective V. Buchanan was able to locate an individual named Christopher Lee MOODY. Detective Buchanan learned through the North Carolina Department of Motor Vehicles (NCDMV) database, MOODY had a listed address in Bahama, NC (Durham County). Detective Buchanan also learned that MOODY is currently on Federal Supervised Release. In looking at MOODY's criminal history, Detective Buchanan learned that MOODY has previously been charged with trafficking cocaine, which occurred in Florida. MOODY has also been charged with possession of a firearm by felon and possession of a firearm in furtherance of a drug offense. Detective Buchanan ran the real property information for the address listed in Bahama, NC, and

learned that MOODY is the owner of the property. Based upon all this information, Detective Buchanan suspected that MOODY was in fact the same "Chris Moody" about which the CS had provided information. Detective Buchanan showed a picture of MOODY to the CS who confirmed that it was, in fact, the same individual to whom he/she was referring.

5. On May 7, 2019, the DCSO SAC/Narc unit established physical surveillance on the residence belonging to MOODY in Rougemont, NC (the Residence).

    a. Upon arrival to the area, Detective Buchanan noticed that a gold in color Honda CR-V bearing NC registration EMJ-8233 was parked under the carport. A check through the NCDMV database revealed that the vehicle was registered to MOODY. Detective Buchanan also observed a white in color "Scoggins and Company" work van parked in the driveway closer to the roadway, and parallel to the roadway. Detective Buchanan noted that the work van had the unique identifier number "2914" on the side and back of it.

    b. At approximately 4:35 p.m., MOODY exited the Residence and walked directly to the passenger side of the white work van. MOODY opened the front passenger door of the van and appeared to put something in the vehicle. MOODY then closed the van door and walked to the mailbox before returning back into the Residence through the same side door.

    c. At approximately 4:42 p.m., a gray in color Honda Accord bearing NC registration FDV-2255 pulled into the driveway. A white female exited the

3

Case 1:20-cv-00007   Document 1-1   Filed 01/06/20   Page 3 of 16

front passenger seat of the Honda and ran to the driver's side of the white work van "2914" where she began to urinate on the ground. The white male driver of the Honda exited the vehicle and walked to the passenger door of the white work van "2914" and opened the door. The white male appeared to remove something from inside the vehicle and place it into his right front pants pocket. The male then appeared to text on his cell phone at which point he removed a wallet from his back right pocket. It appeared he manipulated the wallet and placed something inside of the white work van "2914" on the same passenger side. The male and female then both walked back to the Honda Accord where they entered into the vehicle and left the driveway.

  d. At approximately 5:03 p.m., another Scoggins and Company white work van, this one with the unique identifier "2814," pulled into the driveway of the Residence. The vehicle pulled up to the carport of the Residence and MOODY exited the side door of the Residence. MOODY then opened the passenger door of van "2814" and leaned into the passenger side towards the driver. MOODY then exited the vehicle and closed the door. Work van "2814" left the driveway heading north on North Roxboro Road. MOODY then walked to the original work van "2914" and opened the same front passenger door. MOODY appeared to reach in and retrieve something from the vehicle at which point he placed his hand into the right front pocket of his black gym shorts. MOODY then walked back into the Residence through the same door.

4

e. At approximately 5:09 p.m., MOODY exited the Residence and walked directly to his work van "2914" while appearing to text on his cell phone. MOODY opened the same passenger door of the van and then put his hand in his left pocket, appearing to remove something. MOODY then appeared to place whatever item was removed from his pocket, into the vehicle. After completing this, he closed the door and returned directly back into the Residence while still appearing to text on his cell phone.

f. At approximately 5:27 p.m., a white in color Ford truck bearing NC registration DA-7645 pulled into the driveway. The vehicle parked near the carport of the Residence at which point a white male exited the driver's seat of the vehicle and walked directly to the side entry door of the Residence. The male stayed at that doorway for approximately ten seconds and then returned directly back to his vehicle. Based upon his positioning, Detective Buchanan was unable to see who the unknown male interacted with. The truck then exited the driveway heading north on North Roxboro Road.

g. At approximately 5:34 p.m., a white in color older Ford F-150 bearing NC registration DJC-9512 pulled into the driveway of the Residence. The vehicle backed up to the right of work van "2914" so that the driver's side of the pickup truck was positioned to the passenger side of the van. A white male then exited the driver's seat of the F-150 and entered into the same passenger door of

work van "2914" and appeared to remove something. The male then got back into his F-150 and left the driveway heading north on North Roxboro Road.

    h.    At approximately 5:55 p.m., MOODY exited the side door of the Residence and walked directly to work van "2914." MOODY opened the same passenger door and reached in as if to retrieve something. MOODY then brought his arm back out and closed the door of the van. At that point Detective Buchanan was able to see what appeared to be U.S. currency in the hand of MOODY and MOODY placed the suspected U.S. currency into his right pocket. A photograph taken of this event also depicts U.S. currency in MOODY's hand. MOODY walked directly back into the same side door of the Residence.

6.    Based on these events observed on May 7, 2019, and my training and experience as a law enforcement officer, it appears that MOODY was utilizing the white work van "2914" to stash/stage narcotics for consumers to retrieve and in turn leave money for the narcotics. MOODY would then create a delay before going to retrieve the money earned from the narcotics. Drug traffickers use such a tactic in an attempt to thwart law enforcement observations and to distance themselves from the actual transaction. In addition to stashing/staging suspected narcotics, the two vehicles that went to the carport and had dealings directly with MOODY and/or the Residence were "short stay" in nature, which is also indicative of narcotics sales/distribution.

7.    On May 14, 2019, the DCSO SAC/Narc unit established physical surveillance on the Residence at approximately 5:30 p.m.

a. Upon arrival on scene, Detective Buchanan noticed that the gold in color Honda CR-V was parked under the carport and a white van with "Scoggins and Company" written on it was parked parallel with the road, approximately halfway between the Residence and the roadway. Detective Buchanan also noted that the white van had the unique identifier number on the fender "2914." Detective Buchanan was able to read the NC registration plate affixed to the rear of the Honda CR-V (EMJ-8233) and confirmed that the vehicle was registered to MOODY.

b. Sometime after 5:30 p.m. the white work van "2914" departed the Residence. It returned at approximately 6:38 p.m. and pulled into the driveway and up to the carport of the Residence. An individual later identified as Cyril SCANLAN exited the front passenger seat of the van and MOODY exited the driver's seat of the van. They took some items into the Residence and MOODY returned to the van and backed it into the same parking spot, parallel with the roadway. MOODY then locked the van and walked into the Residence.

c. Sometime after 5:30 p.m. the gold in color Honda CR-V departed the Residence. At approximately 6:47 p.m. an older white male, wearing a blue in color Hawaiian shirt that was unbuttoned, came to the Residence and was jogging slowly up and down the driveway; he then went towards the rear of the Residence and was out of sight. At approximately 6:50 p.m. the gold in color Honda CR-V pulled into the driveway and parked underneath the carport.

7

8. On June 27, 2019 the DCSO SAC/Narc unit established physical surveillance on the Residence.

    a. After a short period of time, MOODY exited the Residence and entered the gold in color CR-V with a female, later determined to be MOODY's girlfriend, Siva SCANLAN. The vehicle left the Residence heading south. The vehicle traveled to and parked behind a residence in Durham, NC, beside a pickup truck. MOODY exited the CR-V and popped the hood of the vehicle. MOODY then went and leaned into the passenger side of the pickup truck and appeared to interact with a male subject who was in the vehicle. After a few moments, MOODY then closed the hood of the CR-V and left the area.

    b. A vehicle stop was conducted on MOODY after leaving the area. Detective Carson utilized his K-9 partner "Tap" to conduct an open air sniff of the vehicle in which a positive alert for the odor of narcotics was given.

    c. A probable cause search was conducted and MOODY was found to be in possession of a large sum of U.S. currency. No items were seized from MOODY during the traffic stop. MOODY and SCANLAN were released without further delay.

9. During the week of July 21, 2019, Detective Buchanan received information from the Person County Sheriff's Office (PCSO) in reference to MOODY. The PCSO stated they had three (3) credible and reliable CSs who provided information

about MOODY. The three CSs stated they knew MOODY to have cocaine and heroin at the Residence.

10. On July 23, 2019 at approximately 7:45 p.m., the DCSO SAC/Narc unit established physical surveillance on the Residence.

    a. Upon arrival, the same "Scoggins and Company" work van marked "2914" and the gold in color Honda CR-V were at the Residence.

    b. At approximately 7:58 p.m., a black in color Ford truck bearing NC registration 800HP67 pulled into the driveway. A white male exited the driver's seat of the vehicle and entered the Residence.

    c. At approximately 8:04 p.m., the same white male exited the Residence and got back into the Ford truck. As the Ford truck began to exit the driveway, a white Chevrolet Tahoe bearing NC registration BCS-5816 pulled into the driveway. The Ford truck left heading north on North Roxboro Road while the driver of the white Tahoe exited the vehicle and went into the Residence and returned after approximately two (2) minutes.

    d. SAC/Narc detectives were able to follow the Ford truck while it was under constant surveillance. While traveling north, the Ford truck was observed to be traveling at approximately 55 mph in a 45 mph speed limit zone.

    e. A vehicle stop was subsequently conducted by Cpl. T. Price. Cpl. Price noted the odor of alcohol emitting from the vehicle, and the driver was

9

Case 1:20-cv-00007 Document 1-1 Filed 01/06/20 Page 9 of 16

unable to produce identification. The driver was identified by information he provided as being Brandon Marshall Overby.

  f. Overby was asked to exit the vehicle to determine the odor of alcohol. Overby then admitted to having an open container of alcohol in the vehicle along with cocaine in the center console.

  g. A probable cause search of the vehicle yielded three plastic bags located in the center console, which contained a white powder substance. A portion of the substance was subjected to a field test kit in which it rendered a positive reaction for the presence of cocaine. The packaged cocaine was weighed and determined to be approximately 15.4 grams.

  h. Overby stated that he had just purchased the cocaine.

11. On July 23, 2019 at approximately 10:06 p.m., Detective Buchanan applied for and was granted a narcotics search warrant for the Residence from a Durham County Magistrate Judge.

12. On July 23, 2019, at 2315 hours, Detective Buchanan executed the narcotics search warrant on the Residence with the assistance of the DCSO SAC/Narc unit and the Emergency Response Team (ERT).

  a. Upon entry into the Residence through the left side door, MOODY was located in the back left bedroom. MOODY was laying partially on the right side of the bed and partially on the floor. MOODY was detained, and Deputy Sharp performed a search of his person. Deputy Sharp located nine (9)

individually packaged bags of white powder in MOODY's front left pocket. A brown in color wallet was also taken off of MOODY's person at that time. Deputy Sharp then immediately turned over the packaged narcotics as well as the wallet to Detective Buchanan. Detective Buchanan read the search warrant aloud to the occupants of the Residence and explained the circumstances.

      b.      The nine (9) bags of white powder were later subjected to a field test kit in which it rendered a positive reaction for the presence of cocaine. The nine (9) individually packaged bags of cocaine were later weighed and determined to weigh approximately 8.3 grams. Detective Buchanan examined the contents of the wallet and located what was later double-counted and determined to be $623.00 in U.S. currency. The currency was seized based upon the nature of the investigation and criminal charges.

      c.      Detective Buchanan then began a search of the Residence, beginning in the back left bedroom where MOODY had been found. Detective Buchanan noticed U.S. currency in plain view, under the right side of the bed where MOODY had been lying. Detective Buchanan photographed the currency in its original location and took custody of same. The currency was later double-counted and determined to be $610.00 in U.S. currency. Detective Buchanan then noticed there was also a white paper towel under the bed where the money was located. Sitting on top of the white paper towel was a plastic bag which contained a chunk of white powder. Detective Buchanan photographed the contraband on

11

the paper towel and took custody of same. A portion of the substance was later subjected to a field test kit in which it rendered a positive reaction for the presence of cocaine. The packaged cocaine was later weighed and determined to be approximately 3.4 grams.

    d.    Detective Buchanan noticed lying on the bed there was a white envelope that had the return address on it listed "Chris Moody" and the address of the Residence. Detective Buchanan photographed the document on the bed and took custody of same.

    e.    Detective Buchanan then began to search the dresser, which was to the right of the bed. On top of the dresser Detective Buchanan located a green in color Mountain Dew can. Upon picking up the can Detective Buchanan immediately could tell that it was a false can that is commonly used to conceal contraband inside. Detective Buchanan opened the can and noticed numerous small plastic green bags with beige powder. Detective Buchanan photographed the can on the dresser where it had been and then emptied the contents of the false can. Inside of the can were two larger clear plastic bags which both contained eighteen (18) individual green bags of beige powder each, for a total of thirty-six (36) bags. There was also a clear plastic bag which contained white pills that were determined to not be a controlled substance. Lastly, there was a plastic bag which contained twenty-two (22) various types of Clonazepam tablets along with four (4) Tramadol tablets. A portion of the beige powder substance in the green bags was

later subjected to a field test kit in which it rendered a positive reaction for the presence of heroin. The thirty-six (36) plastic bags which contained heroin was later weighed and determined to weigh approximately 6.7 grams.

    f.    To the left of the dresser was a small nightstand. Behind the nightstand was a black in color safe. Detective Buchanan located the keys to the safe sitting on top of the dresser where the narcotics had been located. Detective Buchanan opened the safe and noticed numerous checks and checkbooks with the names Christopher MOODY and Siva SCANLAN on them. In the bottom of the safe, Detective Buchanan located a brown in color Crown Royal bag which contained banded up U.S. currency. The currency was later double-counted and determined to be $3,050.00 in U.S. currency. There was also a black velvet bag in the bottom of the safe which contained banded up U.S. currency. That currency was later double-counted and determined to be $7,900.00 in U.S. currency.

    g.    Cpl. Price conducted a search of the bathroom just outside of the master bedroom. Cpl. Price located a digital scale, a green glass jar with digital scale weights, and a drawer full of plastic baggies used to package narcotics. Cpl. Price photographed these items in their respective places.

13. MOODY was transported to the Durham County Courthouse so that all the evidence in this case could be processed. All the seized items were packaged, sealed, signed, and vouchered into a DCSO property locker as evidence by Detective Buchanan. MOODY was transported to the Magistrate's Office where Detective Buchanan went

13

Case 1:20-cv-00007 Document 1-1 Filed 01/06/20 Page 13 of 16

before a Durham County Magistrate, and probable cause was found for Trafficking Heroin by Possession, PWISD Heroin (6.7 grams), PWISD Cocaine (11.7 grams), Maintaining a Dwelling for the Sale of a Controlled Substance, and Possession of Drug Paraphernalia. MOODY was fingerprinted and taken before a Durham County Magistrate where he received a $150,000.00 secured bond, and then transferred into the custody of the Durham County Detention Facility.

14. All contraband that was located in the Residence was seized by Detective Buchanan and transported to the DCSO. Detective Buchanan inventoried, packaged and stored all seized evidence in accordance with DCSO policy and procedure, as witnessed by Cpl. Price. All seized currency was counted by Detective Buchanan and double-counted by Cpl. Price, also in accordance with DCSO policy and procedure.

15. At all relevant times that MOODY was under investigation, described in part above, MOODY was on Federal Supervised Release for a previous federal offense.

16. MOODY has a previous criminal record that includes federal drug and firearm violations, dating back to February 1996. MOODY has a criminal history in Florida for drug related offenses dating back to May 1995, and a state criminal history in North Carolina for drug and property crimes related offenses dating back to June 1993.

17. MOODY's girlfriend, Siva SCANLAN, has a Federal criminal record that includes charges related to an armed bank robbery in 1997. SCANLAN has North Carolina state charges to include property crime related charges dating back to 1993 and drug related charges dating back to 2014.

14

18. DEA adopted the seizure of the $12,183.00 in U.S. Currency that was seized during the July 23, 2019 search warrant executed at the Residence of MOODY and began administrative forfeiture proceedings. On September 9, 2019, DEA received a claim filed by Siva SCANLAN who claimed $11,695.00 of the $12,183.00 in U.S. Currency. In her claim, SCANLAN stated that $6,015.00 of the seized funds belonged to her as a business start-up. SCANLAN further stated that $2,680.00 and $1,800.00 were "car funds" for two individuals believed to be SCANLAN's minor children. And lastly, SCANLAN stated that $1,200.00 was savings for what is believed to be her father. As a result, the administrative forfeiture process was terminated and the seizure of $11,695.00 in U.S. Currency was referred to the United States Attorney's Office for judicial forfeiture. The remaining $488.00 in U.S. Currency will be administratively forfeited.

## CONCLUSION

19. Based on the facts and circumstances related above, declarant maintains there is probable cause to believe that the $11,695.00 in U.S. Currency claimed by Siva SCANLAN was furnished or intended to be furnished in exchange for a controlled substance or represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substance Act, and is therefore subject to forfeiture to the United States pursuant to 21 U.S.C § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

This the __6__ day of January, 2020.

_____
John E. Flamion III
Task Force Officer
US Drug Enforcement Administration